

Hassan Golchini
276 Golden Gate Avenue
San Francisco, CA. 94102
Tel: 415-595-6800
hhgolchini@aol.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

CV  15  0296

Hassan Golchini,

        Plaintiff,

Case No.:_____

**PLAINTIFF'S COMPLAINT**
**JURY DEMAND**

v.

WHO

**Members of the Board of Trustees of the California State University(Comple. ¶ 7)** all in their Individual and Official Capacity; and **Jerry Brown,** Governor of California; **Gavin Newsom,** Lieutenant Governor of California ;**Karen Boss or,** current Speaker of the Assembly; **Tom Torlakson,** The State Superintendent of Public Education, all in their Official Capacity as x-officio Members of the Board of California State University; **Charles B. Reed or,** current CSU Chancellor Appointed Trustees: in his Individual and Official Capacity; **Robert A. Corrigan or,** current President of San Francisco State University in his Individual and Official Capacity; **J.E. Staffold,** Individually and in her Official Capacity as Vice President for Student Affairs at SFSU; **Will Flowers; Kirk Gaston or,** current chief of campus police; **Paul MacLaine; James Czaja; Mike Kleinberg; Jeany Valdez; Jim Roston,** and **Kennedy Wilson Property Management Ltd.;** John and Jane Does 1-50 inclusive, all in their Individual and Official Capacity.

                         **Defendants.**

_____/

**Before the Honorable District Court Judge**

1

PLAINTIFF'S SECTION 1983

Hassan Golchini
276 Golden Gate Avenue
San Francisco, CA. 94102
Tel: 415-595-6800
hhgolchini@aol.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| Hassan Golchini, )<br>      **Plaintiff,** )<br>   **v.** )<br> )<br>**Members of the Board of Trustees** )<br>**the California State University, et al.** )<br>     **Defendants.** )<br>_____/ | Case No.:_____<br>**PLAINTIFF'S COMPLAINT**<br>**JURY DEMAND** |

**Before the Honorable District Court Judge**

*"This '"§ 1983"' originally Claimed with state court (March 12, 2009). It comes before this Court after state court dismissed it (June 28, 2012) for lack of jurisdiction and as soon as practicable after overcoming crossroads resulting from the University's conduct above and beyond wrongdoing in attempt to prevent Plaintiff from pursuing his federal claim occuring from August 1, 2012 through November 6, 2014 (Attached Exh, A, "Declaration of Due Diligence"")*.

## COMPLAINT

1. Plaintiff, Hassan Golchini ('Plaintiff') for his complaint against the Defendants hereby states as follows:

## I. INTRODUCTION

2. This case seeks to protect and vindicate fundamental constitutional rights. It is a civil rights action brought under 42 U.S.C. "§ 1983" and the First and Fourteenth Amendments to the United States Constitution, seeking relief against the university for committing acts under color of law, according to policy and practice with the

intent and for the purpose of depriving Plaintiff of rights secured under the Constitution and laws of the United States, retaliating against Plaintiff for his exercise of constitutionally protected rights in 'voicing grievances', and for refusing or neglecting to prevent such deprivations and denials to Plaintiff.

## II. JURISDICTION AND VENUE

3. This Court has jurisdiction over this complaint because it arises under the Constitution and laws of the United States.

4. Venue is proper in the Northern District of California because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this district.

## III. INTRADISTRICT ASSIGNMENT

5. This lawsuit is suitable for assignment to the San Francisco or Oakland Divisions because the civil action arose in San Francisco County.

## IV. THE PARTIES

### a)  Plaintiff:

6.   At all times relevant thereto, Hassan Golchini, has been a resident of San Francisco California, which is within the jurisdiction of this Court.

### b) Defendants:

7. At all time relevant hereto, defendants Roberta Achtenberg;   Lou Monville; Rebecca D. Eisen; Framroze Virjee; Steve Relyea; Talar A. Alexanian; Kelsey M. Brewer; Adam Day; Rebecca D. Eisen;   Douglas Faigin; Debra S. Farar; Margaret Fortune; Lupe C. Garcia; Steven M. Glazer; Lillian Kimbell;  Lou Monville; Hugo N. Morales; J. Lawrence Norton; Steven G. Stepanek, are Members of the Board of Trustees of the California State University. These defendants' duties include the adoption of rules and regulations pursuant to Cal. Education Code section 89030 that govern the California State University 'CSU,' including San Francisco State University 'SFSU' (Collectively 'university'). These defendants are suit in their individual and official capacities.

8.  At all time relevant hereto, defendants Jerry Brown, is Governor of California; Kevin Newson, is Lieutenant Governor of California, and Tom Torlakson, is California State Superintendent of Public Education; Karen Boss (or current) is speaker of assembely. These defendants are suit in their official capacities as ex-officio members of the Board of Trustees of the California State University.

9.  At all times relevant hereto, Defendant, Charles Reed (or successor) is 'CSU' Chancellor, and an ex-officio member of the Board of Trustees of the California State University. Defendant Reed's duties include the adoption of rules and regulations pursuant to Cal. Educatio Code section 89030 that govern the California State University, including San Francisco State University. Defendant Reed, is suit his official and individual capacities.

10.  At all times relevant hereto, Defendant Robert Corrigan (or successor), is president of SFSU. He is in charge of the day-to-day operations of SFSU. Defendant Corrigan is suit in his official and individual capacities.

11.  At all times relevant hereto, Defendant J. E. Staffold, is the Vice President for Student Affairs at SFSU. Her duties include overseeing campus administration, policies, and procedures. Defendant Staffold is suit in her individual and official capacities.

12.  At all times relevant hereto, Defendant, Will Flower, is employed by 'university'. He is assistant vice Dean of Student Affairs and Conduct Administrator at SFSU. Defendant Flower is suit in his individual and official capacities.

13.  At all times relevant hereto, Defendant Mike Kleinberg, is employed by 'university' at SFSU, and responsible for providing directions to support management, and operation of SFSU off campus housing. Defendant Kleinberg is suit in his official and individual capacity.

14.  At all times relevant hereto, Defendant, James Czaja, is employed at SFSU, and assumes a staff position at Human Resources Department. Defendant, James Czaja, is suit in his official and individual capacity.

15. At all times relevant hereto, Kennedy Wilson Property Management Ltd., is an

independent contractor and provides management services at SFSU's both university park north 'UPN' and university park south 'UPS' off campus student housing facilities. Kennedy Wilson Property Management Ltd. is responsible for the conducts of its subordinates, agents, and/or employees.

**16.** At all times relevant hereto, defendant Jim Rosten, is president of the Kennedy Wilson Property Management Ltd., and a 'university' agent who is responsible for UPN/UPS operational logistics. He is direct supervisor of Defendant Jeany Valdez. Defendant Rosten is suit in his official and individual capacities.

**17.** At all times relevant hereto, Defendant Valdez is employed by Kennedy Wilson Property Management Ltd., and a 'university' agent responsible for managing 'UPN,' at SFSU off campus student housing. Defendant Valdez is suit in her official and individual capacity.

**18.** At all times relevant hereto, Defendants Kirk Gaston (or current chief), and Paul MacLaine are  members of the state school police, stationed at SFSU Campus. Defendant Gaston and MacLaine are the university's agents and suit in their individual and official capacities.

**19.** Plaintiff is ignorant of the true names and capacities of Defendants sued herein as Does 1-50, inclusive, and therefore, Plaintiff sues those Defendants by such fictitious names. Plaintiff will amend this Complaint to allege their names and capacities when ascertained. Plaintiff is informed, believes, and thereon alleges that each of the fictitiously named Defendant is responsible in some manner for the occurrences alleged herein.

**20.** Each Defendant is sued as the agent and/or employer of each other acting in the course and some of such employment or alternatively, acting beyond the course and scope of their authority. Without waiving the alternative pleading, reference in this Complaint to these Defendants' capacity will be within the course and scope of their authority. Reference made in this Complaint to Defendants shall be deemed to mean the acts of Defendants acting individually, jointly, and/or separately.

**21.** Upon information and belief, each of the University performed participated in,

aided and/or abetted, or were deliberately indifferent to the acts averred herein, proximately caused the damages averred below, and are liable to Plaintiff for the damages and other relief sought herein.

22. Defendants in doing the things hereinafter alleged acted under color of state law, and under color of customs and usages of SFSU pursuant to official policies of the CSU, as California State University et al. adopted and enacted by the Members of the Board of Trustees of the California State University acting under color of its authority as such.

## V. FACTUAL BACKGROUND

### A. CSU and SFSU'S Speech Code:

23. SFSU as a public institution of higher learning is mandated to comply with federal and state laws, including the First and Fourteenth Amendments to the United States Constitution.

24. Instead, the University[1] in this case have implemented series of unconstitutional policies and practices ('speech code') that is vague, over broad and suppresses the free speech rights of Plaintiff and others in the campus community.

25. University have conditioned the permissibility of speech on the subjective emotional experience of the listener and have enacted regulations that limit and prohibit speech without providing any objective guidelines by which Plaintiff and its community members can guide their behavior.

26. University's 'speech code' lacks clear standards to guide the discretion of the public officials vested with the authority to enforce this policies thereby enabling the officials to administer the restriction on the basis of impermissible factors in violation of the Free Speech Clause of the First Amendment, and the protective Clauses of the Fourteenth Amendment.

27. The University policies restricting student speech (the "Speech Code") are comprised of the various documents and publications that govern student life at the

---

[1] University and Defendants are interchangeably used and means the same: all Defendants

6

PLAINTIFF'S SECTION 1983

University, including the Student Code of Conduct; the Sexual Harassment Policy, and the Student Organization Handbook.

28. These governing documents contain policies which place restrictions on student expression at the University. These constitutional defects give rise to both facial and as-applied constitutional challenges to the discriminatory policies.

29. As relevant to this complaint, the applicable challenged policy is the 'Student Code of Conduct' (2007).

30. "The SFSU's student code republishes California Code of Regulations, Title 5, section 41301. California Education Code, Title 3, section 89030 gives the CSU Trustees including Defendants herein, the authority to adopt regulations governing CSU campuses."

31. "The CSU Trustees promulgated California Code of Regulations, Title 5, section 41301. The Student Code is enforced at SFSU by Defendants Corrigan and Staffold, and requires student to abide by certain responsibilities. One responsibility of students is that they "be civil to one another and to others in the campus community..." Cal. Code Regs. tit. 5 section 41301 (2007)(emphasis added)."

32. "The SFSU's student code also contains a list of unacceptable student behaviors that are subject to disciplinary sanctions, including, conduct that threatens or endangers the health or safety of any person within or related to University community, including physical abuse, threats, intimidation, harassment, or sexual misconduct (emphasis added).

33. "The Student Code does not define intimidation or harassment. "

34. Violation of speech code results in punishment ranging "from a disciplinary warning to suspension, or termination from the University."

35. Where a student is employee and residence of its campus housing, the university applies these policies and extend its punishment to include termination of employment, eviction from campus housing, seizure of property, and expulsion from university, as applied to Plaintiff.

**B. SFSU'S Discriminatory Treatment of Plaintiff:**

36.    Plaintiff was a graduate student at California State University (CSU)--San Francisco Campus (SFSU)--and was employed as a member of SFSU"s library staff. In June 2005, he rents a two bedrooms at StonesTown Apartments owned by De-Anza realestate. Two months later, CSU having purchased the StonesTown Apartments, the ownership transfered, and it becomes an addition to SFSU its off campus housing under University Park North (UPN). Subsequently, a contractual lease agreement was signed between Plaintiff as a tenant and SFSU as owner.

37.  Shortly after, plaintiff accidentally discovers documents, some of which bore his identity suggesting wrongdoings at campus.

38. He investigates the matter uncovering improper activities at university, among others, identity theft, corruption, and other improper activities.

39.   In December 2005, as a victim, he began to "speak up" about the matter. Suddenly, his environment turns hostile, his apartment and car vandalized, verbally attacked and told to leave.

40. In January 2006, Plaintiff takes the matter to Defendant Valdez, manager of 'UPN,' expresses concern for his safety, requests to move to another apartment, and informed Valdez that he intends to take them to court.

41. At that moment, two officer from campus police, Defendant John Doe3+4 rushed into the office and came at Plaintiff which frightened him thinking of they may attack him. They insulted him with offensive and racist slur, demanded, "get out of here you f... t...you think you can sue school."[2]

42.   Defendant Valdez joins in and with anger told Plaintiff that, " you cannot move to another unit, you better quit and leave."

43. Subsequently, in more than two occasions, Plaintiff made effort to report the situation to both the Defendant Kleinberg , supervisor of SFSU off campus housings, and Defendant, Rosten 'UPN' operational logistics. He could not reach them, left few messages about the the situation, and expresses concern for safety and

---

[2] School refers to 'San Francisco State University.'

requested for intervention and resolution of the matter.

**44.** Shortly after, the alarming events intensified, and his apartment, again, vandalized, verbal threat esculated and aggressively told " shut up and leave." A premeditated assault and robbery followed, which his credit cards, ATM, IDs, and other important financial and personal cards and information compromised, and he was told to leave.

**45.** By the end of January, there was so much to deal with and things starting to worry him. Plaintiff then takes his supervisor's advice in taking a sick leave. After two (2) extensions, on February 1, 2006 having received his outstanding work performance review he takes his annual two weeks vocation in order to see what should be done to prevent from being harmed more than he already was.

**46.** Four days into his vocation, he received a letter from Defendant James Czaja informing him that, he was suspended from work and should not return to library until further notice or completion of an investigation. The letter did not explain any specifics, or any reason for his suspension, nor did it say what was to be investigated. Plaintiff had no idea what to make of this suspension notice. Just four (4) days ago not only a senior staff on behalf of himself and Dr. Masters, the Library President had commended Plaintiff for a year of excellent performance, but also Plaintiff was offered promotion with 100% salary increase by the Library Controller Mr. Uchida, to manage the Library Copy Center, one of the most challenging position at 'SFSU'. He was to begin his new position after returned from vacation.

**47.** Subsequently. Plaintiff tried to contact James Czaja to find out why he was suspended, but Czaja was no-where to be found or, he did not want to be contacted.

**48.** In the meanwhile, to avoid mistreatment and protect his property, Plaintiff confined himself to his apartment.

**49.** In the end of February, Defendant Valdez called Plaintiff to her office and told him that if he was not going to move out, he must pay two months rent in advance in form of cash. Plaintiff objected and inquired why should he pay for two months,

and why he could not write a check like he always did for one month, like everybody else. Defendant Valdez said, "fine, if you don't like it, I suggest you move out and leave, it has to be for two months and cash."

50. Plaintiff reluctantly paid about $3000.00 for two months rent in cash. He, once again, made effort to report the abuse to Defendant Kleinberg and Rosten. He was unable to reach any of them, but told that he should leave message. In his message, Plaintiff briefly mentioned that, he previously has left a message concerning Defendant Valdez, and difficulties he was facing at 'UPN.' He explained the second exchange that took place between him and Valdez. He told Kleinberg and Rosten that he believed Ms. Valdez's behavior towards him was improper and he has not done anything that would have warranted such a treatment. He said he just made a complaint and that should not be a reason for being treated with such an attitude, differently from other tenants. Plaintiff asked for resolution of the matter and that he was hoping it would quickly be addressed before things get worse than already is. Since, Klienberg had not returned his calls, Plaintiff made an effort to contact Director of SFSU Housing, but unable to reach him.

51. Shortly after, series of aggravated harassment followed, among others, verbal threats to leave aggressively continued, the fire alarm would go off at odd times after midnight. He was rushed to 'Kaiser Emergency' for an unusual food poisoning. The campus police raided his apartment, trashed everything, and threatened him to sign consent or they kick him out. In one occasion, the Fire Department axed down his front door due to a prank call. Plaintiff made few requests to have the front door fixed. The defendant Valdez deliberately ignored his requests and did not fixed or changed the front door and left him in the open without safety and security. His mail frequently were missing and his correspondences, communications compromised; in particular, financial matters.

52. in March 2006, his apartment, once again, burglarized and he noticed that his desk drawers were dumped on the floor and his files and documents were scattered about. His computers in both living and bedroom were either upside down or on the

10
PLAINTIFF'S SECTION 1983

floor. His two phones were out of place. He quickly run a check throughout his apartment, and noticed some of his files are deleted from his computer, and some of his documents were missing.

53. Plaintiff called San Francisco Police Department 'SFPD' to the scene, and put some documents together to assist investigation. His effort to get 'SFPD' involved failed when Defendants MacLaine and Doe officers barged into his apartment and interfered with investigation by telling 'SFPD' Officers that they taking over, they "have interest in the case...he has problem... we are trying to help him."

54. The SFPD officers reluctantly had to leave. Then, Defendant MacLaine took plaintiff's documents and told him that," he could not call 9/11 or talk to SFPD...here, we do everything ourselves...school matters remains in school and for anything, he should only call us."

55. They left without taking any notes, making a list of the missing items, or fingerprinting the apartment.

56. Next morning, the Doe Officers returned and told Plaintiff that he was suspended from his apartment for a week because he had called 'SFPD.' They also demanded that he should consider quitting and leaving San Francisco.

57. Because of these incidents he felt humiliated and in shock. He was frightened, felt depress, and did not know what to do or how to seek help.

58. Ultimately, in Mid-March, Defendant Czaja agreed to meet with plaintiff at campus police to discuss his suspension from work. Plaintiff wondered why the meeting should be at campus police. It absolutely made no sense. At the meeting, Czaja would not tell him anything except ordering him to quit and leave.

59. Plaintiff said he was not quitting and was going to retain a lawyer and take care of this in the court. Czaja told him he did not need lawyer, and if he wants to resolve the matter, he should contact 'union' in the university. Plaintiff believed him.

60. In the next meeting with Czaja, 'union' agent told plaintiff to quit because he did not know who he was dealing with. This university is the most powerful state

agency in California, they have their own policy and did not need to explain anything to anyone. They gave you a job, now hey tell you to quit, and they do not need to explain anything and you cannot do anything about it.

61. Plaintiff said he was not quitting. Czaja told him , " fine, you should apply for disability retirement." "Everybody knows you have mental problems, you should not have any difficulty getting disability." "You should start the process as soon as possible. In fact, tomorrow go see the disability coordinator."

62. Plaintiff said it was fine. Subsequently, five days to his suspension from his apartment, they let him go back to his apartment.

63. When returned home, he calls campus police, request for a copy of their report with respect to burglary and suspension. He was told that they let him know. Shortly after his conversation, Doe Officers came to his apartment, grabbed him by shoulder, put him in a car, and drove him into General Hospital and admitted him into Psych Ward.

64. While, his disability evaluation was in progress, he was attacked one block from his apartment on Winston Drive by three identifiable individuals, and told if he did not leave he was really going to get it. He managed to run to the first store he saw at the "StonesTown Shopping Center" and asked the manager to called the police. When police arrived, they started their inquries.  As it turned out none of the survailence cameras in the shopping center were working. The police then arrested the Plaintiff because of a fraudulent testimony.  In the police station, one of the arresting officer came to holding cell and told him that, "it looks like you are being set up." get a good lawyer and straight it up in court." Because of this development, he was jailed. Then, he paid $3000.00 to bail out of jail in a hope to find out what was going on.

65. As to its disability retirement, approximately in the end of March, after series of evaluations, he met his eligibility requirements and his disability retirement was approved by university, and an appointment scheduled for April 14, 2006 to finalize the process. Nonetheless, the effective date of benefits agreed to be as of April 1,

2006.

**66.**   On April 13, one day before its appointment to finalize its disability retirement, about 11:45 A.M., Defendant Czaja called Plaintiff inquiring when his disability would be finalized. Plaintiff responded that it would be tomorrow. Shortly after his conversation, Plaintiff drove to SFPD Taraval Station to inquire about protective order to prevent further harm.

**67.**   After his inquries with SFPD, Plaintiff took 19th Avenue and drove home. While he was pulling to the curb front of his apartment building, he was surrounded by police and handcuffed. He was told by Defendant MacLaine (campus police) and Doe Officer5 (SFPD) that an individual has called and said that, " you pulled a gun at him while driving through (indiscernable) street...and just now he has confirmed that it was you." As much as Plaintiff tried to tell them that he just left SFPD- Taraval Station which is the other side, he took 19th Avenue back and forth, they did not want to listen, and jailed Plaintiff.   Then, Defendant MacLaine came to jail and handed him a letter that his suspension from work is going to be without pay because of his arrest. University through its agents trump up  number of charges (Six) all felony having to do with act of terrorism with use of gun, and used the court to have him convicted.

**68.**   Although,  he never had a chance to participate in the hearing to proof his innocence, in the court however charges of  feloney and use of a gun was ruled out, but he was convicted of one miscdemeanor, but Plaintiff did not know what the conviction was and why he should be convicted. Then, they gave him to immigration to be deported.

**68.**   Ultimately, immigration let him go. Plaintiff then went home and noticed that his car was missing. While, he kept some file in his office, his car however was the only safe-heaven he had where he secretly kept his laptop, and files that had to do with its discoveries on improper activities in university.

**69.**   He imediately calls campus police, asked for Officer MacLaine. In response to Plaintiff's inquiry about his car, MacLaine would not tell him anything except that it

was towed on the day he was arrested.

70. Plaintiff said his car was front of his apartment building, why it was towed. MacLaine said," it is the procedure."

71. "Plaintiff went to 'SFPD' headquarter and learned that there was nothing in SFPD database about his car. Later, he learns that  university atually had stole his car and towed it out of the county taking Plaintiff's evidence, documents, laptop containing important information, and discovery that had to do with illegal activities at university.

72. University's unreasonable action, had a devestating consequenses. They took his files; it cost Plaintiff $6500.00;  he was jailed (held in the psych ward), and given to immigration; University did not give him any more paycheck; his disability retirement left in limbo; and he never saw his car again, and among other punishments,  his privacy was surrendered to loss of search and seizure right, and his apartment became a target for Officer Doe1-3, to walk in at anytime and trash it and take his papers.

73. On May 10, 2006, approximately at 8:40 A.M., Defendant Valdez in a joint participation with campus police pushed his front door open and walked into Plaintiff's apartment with Defendant officer John Doe1+2, fully uniformed with badge and gun. Plaintiff was sitting in the living-room couch having breakfast. At the site of these people he violently trembled and could not breathe. The coffee cup in his hand fell and hot coffee spill on his right forearm ( He suffered a third degree burn).

74.  Defendant Valdez without any explanation demanded that, "you are going to leave now, out." "You are evicted." Defendant Officer Doe1 told plaintiff that, "you're gonna have to leave your property here."  Defendants John Doe1+2, make Plaintiff to believe that he could pick up his property following completion of process. Subsequently, similar assurances were given by Defendant Valdez that he could call her office make an arrangement for removal of his property.

75. While still trembling, plaintiff managed to say," can I change my clothes, take

my papers and..." He was promptly interrupted, unable to complete his sentence when all three Defendants together told him "No."

76. Plaintiff earnestly asked to let him take his two prayer books, they belong to his faith, and he must have them for his prayers. He also said that there are two pictures he needs to take with him, one was his daughter's and the other his parents that have long been past and this pictures were the only thing he had left to remember them. Defendant John Doe1 said, "what part of a 'No' you did not understand!"

77. Plaintiff frightened and did not know what to do. They never had served him with any paper, and did not show him anything now, except repeatedly saying that they need to complete the process. But, they do not say what process was that.
He politely managed to say that whether they were going to take inventory and wheather he could have a copy. Officer John Doe2 abruptly said, "you are going to get your stuff...we just need to complete the process first."

78. Plaintiff was shaking, and experiencing excruciating pain on his right forearm where the hot coffee spilled, he was scared, and thinking the things might get worse and they might shoot him. While made effort to stop tears from falling down, he said O.K., and forced to walked away from his home leaving behind his heart and soul.

79. After he was forced out of his home and university's community, he called Czaja many times to find out about his retirement. Czaja would not take or return his calls to give him some answer as to his disability retirement status, nor would Valdez for his property.

80. Since Defendant Roston nor Kleinberg had returned his calls, Plaintiff sought help from a colleague and asked him to see if he could talk with Valdez and convince her to give him his property, at minimum his prayer books and pictures of his daughter and late parents, because they could not be replaced.

81. Ultimately, in the end of July 2006, Contrary to prior assurances, the Defendant Valdez contacted Plaintiff, told him that he was not getting his property, nor his

deposit.

**82.** At the same time, Defendant Czaja called Plaintiff to meet with him to get the information for finalizing his disability pension. Czaja also said that, "to compete the process you need to go outside the county, that is why I want you to come to my office to get the information."

**83.** Plaintiff met with Czaja, but in his disbelief, Czaja threatened him to resign or he was going to fire him and he would never be able to work in this country anymore. Plaintiff's effort to find out about his disability retirement abruptly stopped by Czaja's threatening remarks that, "a mouse is trying to play with a lion's tail."

**84.** He gave Plaintiff a check, about $700 or so, and called it 'final check.' Czaja told Plaintiff that date of his termination was in the end of July! Plaintiff asked why end of July, he has not been paid in the past six months., what is this...where is my pay? Czaja merely said, "that is it." Plaintiff no longer could stand Czaja's improper attitude, and said that he will take a legal action. Czaja responded that, "we do not have to answer to anyone, and it is better for you to leave San Francisco."

**85.** "Shortly after his termination, while in his room, two individuals violently break into his front door and attacked him with the use of a deadly weapon. Plaintiff was assaulted, robbed and told that, "it is time to leave...take the plane this afternoon...or, I take you out!"

**86.** Approximately in the end of August, 2006, Plaintiff received a mail from "UPN" university's off campus housing. It was acknowledgment of a lease under his name at his previous apartment. Rent was paid to the end of September 2006, it reflected method of payment, amount paid, and other fees paid for some services done at the apartmrnt. The monthly rent and other charges for services indicated benefit applied for active employment status. The SFSU employees paid less rent than other tenants.

**87.** Plaintiff was trying to cope with the mental suffering and preoccupation

ensuing the recent events, especially with traumatic incident, he was unable to understand what to make out of this document or what to do. Two individual offered to help.

88. While, the inquiries were in progress, he was again assaulted and robbed by the same individual responsible for August incident. He was accompanied with different associates, and again told Plaintiff that he better leave or else.

89. In October, with mountain of difficulties, Plaintiff managed to get a smal loan and buy a used 'SUV' to live in it for safety reasons. Unfortunately, just two-to three weeks later, they break into his car and sabotaged the break-lines (per SFPD inspector). Plaintiff had an accident, run into a brick wall. He could have died. He was seriously injured and his car severely damaged. He was terrified thinking he is going to lose his life.

90. In November 4, 2006, his insurance carrier arranged for a rental while having his car repaired. The rental car was "Enterprise" at 'SFSU' branch for pick up. On November 21, 2006, because of his April wrongful conviction, he was to report to San Francisco Sheriff for community work assignment. He had called and talked with sergeant and requested for extension. Sergeant gave him extension and told him to come and pick up his new schedule. He drives to station, and park his rental car in the McDonald parking lot next to the Hall of Justice and walks to the Office of the Sheriff. The sergeant was not there but he had left a note. A deputy sheriff demanded seven hundred fifty dollars for the program. He said he did not have money because he was unemployed. Deputy Sheriff said, "then you go to jail for twenty four days." He told to Sheriff that Sergeant gave him extension. Deputy acknowleged but told him that he was going to jail because he did not want to pay for the program. Plaintiff explained to deputy sheriff that he has a rental car parked outside; he had his laptop and important documents in the car (Plaintiff was mainly concerned with discovery information that resulted from investigation two individual conducted few weeks ago). He earnestly asked to let him remove his stuff from the car or to call Enterprise. A second Deputy Sheriff volunteered to call

PLAINTIFF'S SECTION 1983

Enterprise to take the car and to keep his property until he is released. While, in jail, his lawyer also called 'Enerprise' to assure that Plaintiff's property were safeguarded.

91. After released, he made a substancial effort to get his laptop and papers from 'enterprise.' But, each time he was given one excuse after another, and told to call later. Then, campus police gets involved, but instead of helping Plaintiff, they took side with 'enterprise,' and in March Plaintiff was jailed again.

92. About this time, University through Defendants   Valdez and Rosten, by submitting three (3) false declaration to the court without any knowlege of Plaintiff and obtained   a default civil obligation and an eviction judgement in absentia. Everything was concealed from Plaintiff to prevent him from going to court. If he knew there would not be any eviction judgement because no law in California, or any state in this country, even any where in this world wouls evict somebody from a place where he does not live there.  University fraudulently represented to court by submitting three false declaration that Plaintiff had been served with three days notice and notice to appear and lease agreement unavailable. In February 2009, long after university maliciously obtained this judgements, Plaintiff learns about it through public record. University by taking advantage of the legal system without any reason, justification fraudulently obtained a default civil obligation and an eviction judgement against Plaintiff. This judgement actually obtained for more injurious purposes.  The eviction judgement reflects on public record for ten (10) years.  Giving out bad reference and together with bad credit, university ruinned Plaintiff chances in gaining employment and housing for the next ten (10) years. Not only that, it also put an end to any prospective loan or finance of any-kind Plaintiff might have had.  In so doing, Plaintiff remained homeless and penniless, and consequently, under university's dominion.

93. In early May 2007, plaintiff saw a former colleague from 'SFSU.' He expressed his concern, and offered to help. He strongly advised plaintiff that he should discuss the matter with someone, and it would be better to follow university's instruction

and discuss it with them because he should think about his graduate program and earned diplomas.

**94.** On May 22, 2007, Plaintiff sought remedy for his injuries by submitting a formal Notice of 'demand to pay' to university claiming compensation for his injuries. He also informed university of his intend to file with the court if university failed to resolve the issues.[F-3][3]

**95.** University becomes angry and so adamant to get rid of Plaintiff altogether. University then restricted Plaintiff's access to facility, closed his student email account, interfered with discovery, and he was unable to access record. University denied his request to get his personal property, files, and documents from his old office in the library, and claimed that his personal files have been deleted from office computer and his other documents, personal stuff no longer at his office. There is more, each and every time he was in SFSU main library, or the computer lab trying to meet his class assignments, Defendants Officer John Doe's would have come to the library demanding that he should leave. Plaintiff's objection would have promptly stopped by " leave or jail." Despite of the fact that his tuition and fees fully paid, he would have immediately left.

**96.** He started going to down-town campus, using the computer lab there. On his third visit, the campus director came to the lab and said he needs to talk to him. He told Plaintiff that, "Gaston just called and said that not to let you use the lab and should leave, and if you refused, he'll come here and arrest you." The director said, "I have checked the admission record...I know you are enrolled for Fall... you are not in default." "if I were you, I talk to Gaston...you paid your fees like everybody else...Find out what is going on."   Plaintiff politely inquired, who is Gaston?  The director said that he was chief of SFSU campus police.

**97.** In more than two occasions, Plaintiff went to campus police, but told that Gaston was unavailable. Under the circumstances, to avoid mistreatment, the

---

.[3] During this chaotic time, Plaintiff filed two complaints with this Court. He requested for fee waiver. His complaints dismissed for failure to state claim and defendants on those complaints were not served. Plaintiff's complaints involved different wrong and was  not against CSU Trustees.  Explanation is attached hereto,  Exh, C,"Previous Lawsuit."

PLAINTIFF'S SECTION 1983

24-hours lab at SFSU main library in the late evening or early morning sound promising.

**98.** On September 11, 2007, approximately at 1:30 A.M., on his way to library, one block from university, he was attacked by four individuals, yelling that, "mother fucker, you going to court." Plaintiff runs, but one of them jumped in his car a white...sudan taking off with an incredible speed and run him over. When he opened his eyes, he saw a young coed kneeling down next to his head and crying. Though, hardly discernable, she said," I saw you six(?) feet in the air and crashed here. 'I thought you died...' Plaintiff remembers hearing siren. She still was saying something about 9/11. Plaintiff does not remember anything after that. Two days later, he told that he was in the San Francisco General Hospital at Trauma ward.

**99.** After this incident, fear and feeling of losing his life affected his mental state interfering with his ability to make decision, lost his grip and was unable to aqdequately perform his daily activities independently. Plaintiff would seek help from 'GAAP'[F-4][4] for letters, phone calls and other necessary matters. Especially, keep contacting 'enterprise' to get his property.

**100.** The perpetual mistreatment ultimately defeated Plaintiff, and he checks his school record to initiate process to exit university and obtain his diplomas in order to leave. Unfortunately, the record indicated that he had administrative hold. While, he was trying to find out what was going on, he receives a letter from assistant dean, Defendant Flowers, asking him to call his office and make an appointment for investigation purposes concerning a complaint.

**101.** Plaintiff immediately called Defendant Flowers office and asked for an

---

[4]   GAAP = General Advocacy Assistance Project located on Golden Gate at Hayes (Plaintiff's mailing address). 'GAAP' is a public benefits clinic founded by a group of students from Hastings College of Law in 1985. Their function is to help homeless and those who live below poverty line in variety of issues.They let you use computer, phone, fax, copy document, help you with forms for child support, small claims. They do not assist nor advise with any civil or criminal case.

PLAINTIFF'S SECTION 1983

appointment as instructed. He was told Defendant Flowers was unavailable and call back in a week.

102. In the meanwhile, Plaintiff learns that a criminal charge has  been filed against him with the district attorney's office by an 'Enterprise'  employee, recommended by a officer MacLaine from SFSU.

103. As they had in the past, following the same pattern, Defendant Kirk Gaston and Paul MacLaine, in a joint participation together with an employee of 'Enterprise' trumped-up a criminal charge without probable cause in violation of state law subjecting Plaintiff to prosecution to convict and jail Plaintiff. Likewise, they subjected Plaintiff with the same charge to a disciplinary action with university in violation of university's policy--student code of conduct in order to expell Plaintiff from university.

104. The false charge was supported  with a fraudulent statement filed by university through its agent Defendant MacLaine.  It was brought to prosecute Plaintiff in attempt to have him criminally sanctioned and jailed.  But, the truth was something else.  The same charge was also against Plaintiff in violation of university's policy-student code of conduct filed by Defendant Gaston. Conviction by court would justify his expulsion from university in breach of university's policy because it was based on the same charge.  University then would  successfuly expelled Plaintiff and covered up the true facts surrounding stealing Plaintiff evidence, and rest assured that incriminading evidence is kept away from discovery, court, and jury.  For this reason, Defendant Flowers would not take his call, and waiting for Plaintiff to be convicted first.

105. For the false criminal chages, Plaintiff appeared before the Court, and at his arraignment, deputy district attorney 'DA' requested from the court that he should remain in custody and held without bail.

106. 'DA' support his argument by producing a letter sent by Defendant MacLaine and informed the court that, SFSU campus police informed our office that he [Plaintiff] was a nuisance and they do not want him at SFSU." 'DA' again requested